We'll hear argument next in Case 22-529, Cantero v. Bank of America. Mr. Taylor. Mr. Chief Justice, and may it please the Court. Section 25B preempts a state consumer financial law only if, as relevant here, it prevents or significantly interferes with the exercise of a national bank's powers. Bank of America argues, and the Second Circuit held, that this statute preempts any law that controls or otherwise hinders the exercise of a national bank's powers, regardless of whether the law has any significant effect on such powers. This test conflicts with the statute for four reasons. First, Section 25B's definition of state consumer financial law is incompatible with a control test because it would require that every such law be preempted, nullifying the statute and erecting the very field preemption regime that the statute forbids. Bank of America's only retort is to concede that state fair lending laws aren't categorically preempted, a concession it doesn't explain and that disproves its own test. Second, the control test ignores Section 25B's express codification of Barnett Bank's prevents or significantly interferes with standard, and in particular the word significantly, which Bank of America reads out of the statute. Third, a control test can't be squared with Section 25B's provisions for OCC preemption determinations, which must assess the impact of a state law and be based on substantial evidence. These requirements would make no sense if a control test were the law. Finally, and perhaps most fundamentally, adopting a control test would require reading virtually all of Section 25B to have no real-world effect. With no plausible textual argument, Bank of America turns to policy, claiming that its test is needed to avoid mayhem, but Congress disagreed, and Section 25B has a solution to this concern. The OCC can make the preemption determinations contemplated by the statute, but it has thus far failed to respect the statute's commands, grants no license to this Court to do the same. I welcome the Court's questions. I'd be interested in you giving us your explanation as to how Barnett Bank gives us guidance as to how to interpret prevents or significantly interferes. Sure, Justice Thomas. So Barnett Bank uses the prevents or significantly interferes with standard as a kind of distillation of the rule that emerges from this Court's cases. Now, of course, the conflict that was issued in Barnett Bank was a stark conflict. It involved a state statute that said banks may not do X, and a federal statute that said national banks may do X, and this Court was able to resolve that as a clear conflict. But it didn't give much guidance itself in terms of what significant interferes with means, but it did articulate that as the standard that emerges from this Court's cases, and the first case that it cited was this Court's decision in Anderson, and Anderson involved a Kentucky escheat law, and the Court in that case, there was a preemption challenge that was brought to that statute by the national bank, and the Court in that case said that's not a discriminatory statute. It was the first question the Court asked. It doesn't conflict with any statutory text, and so we examined the law's practical effect, and in examining the law's practical effect, it distinguished a prior decision from this Court that reached the opposite outcome, and the only way to explain that pair of cases is that the Court examined the practical effect, and so I think the one thing that we know of the prevents or significantly interferes with standard and what it means is that it requires an examination at a minimum of the practical effect of the statute, and that's clear from the ordinary meaning of the phrase, and it's confirmed by the surrounding text in Section 25B, including the provision that requires that the OCC examine the law's impact based on substantial evidence and periodically review. What exactly does it mean to examine the practical effect? I mean, why don't you talk about this law and say how an analysis of that kind would work with respect to this law, and then maybe say anything more general you want, because it seems to provide no guidance at all to courts as to what they have to do. Yeah, and we'll answer that question directly, but I will say that because of the way that Bank of America has argued the case and the way that the Second Circuit decided the case, the only question that this Court has to confront is whether the control test is codified as part of Section 25B or whether instead courts must look to the practical effect of the law. I appreciate that, but one thing that we should think about at least in considering whether the practical effect test that you're suggesting is the one that's codified and is the appropriate one is what would that mean? What would it look like? And then we can consider whether that's what Congress had in mind. Yeah, so it might look like the showing that the National Bank made in Franklin National Bank, for example, and I would recommend that you look at the trial court decision in that case. So that case involved a federal statute that granted to national banks the authority to accept savings deposits, and New York had a statute that didn't prohibit national banks from accepting savings deposits, but disabled them from using the word savings in their business operation and in their advertisements or any equivalent thereof, and reserved to certain state institutions the privilege to use that word. And what the national bank said in that case, it identified real-world evidence showing the tremendous extent to which that law served as an obstacle to it attempting to accept savings deposits in its business operations, and the trial court in that case found what is effectively significant interference. And by the time that case got to this court, this court, although it resolved the question before it based on statutory construction grounds, emphasizing the federal statute's use of the word savings, I think it had confidence based on the record before it that that word mattered in the real world. And if that standard had been used here, what would that have meant? What evidence would the parties have put on, and how would the court have addressed the issue? So the legal question would be whether there's significant interference, and we think that looks to the practical effect, and Bank of America would have to identify what the practical effect is. I think it would be particularly easy for it to do so here because we have a statute that's been on the books for 50 years. State banks have been complying with it. Most federal banks, it's my understanding, have been complying with it, and indeed there was a preemption challenge that was immediately brought, and it failed, and presumably national banks were complying with it after that. And so they could look at the data showing the extent to which this minimum interest requirement has caused banks to not offer mortgage escrow services, which would be the relevant power, to consumers. And I think it would just be a question of degree at that point, and I would concede that it's not a bright line test. Congress didn't want a bright line test. It had before it various proposals that would have been a bright line test, including field preemption. That's administrable, but we know that Congress didn't want that. And on the other hand, the Department of the Treasury submitted a proposal that would have made preemption determinations turn entirely on whether the law is discriminatory. That's also administrable, but in the judgment of Congress, that didn't go far enough to provide protection to the banks, and Congress wanted to give banks as an accommodation the opportunity in a case-by-case basis to show that there's a significant interference, and that's the scheme that- Can I just ask about Franklin, because I think Franklin's a critical case here, because it's identified in Barnett, identified in Waters. And in figuring out, as Justice Kagan and Justice Thomas said, what significantly interferes means, I think one way to do it is look at the precedent applying it. So Barnett, you look at that first, but Barnett really rests heavily on Franklin. We know Franklin is correctly decided under the statute. You agree with that? Agree with that entirely. Okay. So then the question, I think one way to look at it, you tell me why this is wrong, is does this kind of state law at issue here significantly interfere more than the law did in Franklin? Is that a good way to look at it? You could put it that way, yes. Okay. And doesn't a law that interferes with the pricing of the product almost by definition interfere more with the operations of the bank than something that affects advertising? I don't think so, Justice Kavanaugh. The question isn't whether it would cost money to the bank to comply with the statute. The question rather- Let me stop you right there. Why not? That sounds like significant interference when it's affecting how much- It's almost putting a tax on the bank to sell the product, which strikes me as a much more significant interference than simply saying you can't use the word savings in your advertising, which was the issue in Franklin. Well, if the test for preemption turned entirely on compliance costs, then a whole bunch of generally applicable laws that my friend on the other side concedes are not preempted would nevertheless be preempted if it cost money to the bank to comply with those. So I don't think compliance costs alone are enough. I think what you need instead is what this court said in Barnett Bank, which is it's not enough that there just be significant interference with profits. The question is whether there's a significant interference with a power that Congress explicitly granted. So the focus is on what- But how did that happen in Franklin? In Franklin, the bank could do everything that it previously did. It just couldn't use the word savings in its advertisement, which didn't prevent it from exercising its power. That's right, but as I was explaining to Justice Kagan earlier, if you take a look at the record in that case, that case shows that a factual showing can be made and was made in that case, and I would commend the trial court's decision there because I think it's illuminated for this question. And everyone in the case seemed to understand, coming on the heels of Anderson, that there was going to be some kind of a practical showing. And this court noted the large record showing the real-world consequences of the law in its opinion, and there was all kinds of- there was testimony, there was consumer polling, there was lost sales, there was a significant amount of data showing the degree to which this prohibition had a real-world effect. Isn't it true that the New York Court of Appeals, when it upheld the law, said that it had no, quote, seriously harmful effects on national banks? That may have been what it said, but if you look at the trial court's finding in the case, the trial court found that based on the evidence that I was discussing with Justice Kavanaugh, the law, quote, certainly restricts national banks tremendously in obtaining savings deposits. And that's effectively a finding of significant interference. The law said they couldn't use savings in their advertising, but they could use a comparable phrase like special interest account. So if any interference that's greater than the interference there is enough, I don't see how you can win under that. Two responses, Justice Alito. If you look at the testimony in that case, it was clear that consumers had no idea what interest-bearing account meant. I mean, the word savings actually mattered to their purchasing decisions and had a real-world effect, and that was a law that was discriminatory and put the national banks at a serious competitive disadvantage vis-a-vis state banks. And, of course, under this statute, a discriminatory law would be preempted for independent reasons. And so the way that this statute is designed is that non-discrimination is the most important principle that runs through the statute. And if a law is non-discriminatory, then I think we can assume that the hostility that states have traditionally shown to national banks are not going to be reflected in their laws because we're only going to be talking about laws that involve restrictions that states are willing to impose on their own banks, and they're not going to devour their own. Do you think that the significant interference test should be applied on a bank-by-bank basis or on an industry basis? No, it's not bank-by-bank. That's not how it works in our view. If you look at the statute, it's clear that when the OCC makes preemption determinations, it does so on a law-by-law basis, not a bank-by-bank basis. And even there, in consultation with the CFPB, it can make preemption determinations that go beyond that law and reach substantively equivalent laws. Is that a question of a pure question of law? Is it a mixed question? Is it a question of fact? The ultimate preemption determination... No, the question of whether it significantly interferes. Is that a question of fact? It's a legal question for a court. But because it takes account of the practical effects of the law, you have to know what those effects are. And it's going to be if the OCC hasn't identified the effects, then it's going to be incumbent on the bank, if there's no statute on point and we're talking about a non-discriminatory law, to explain what those effects are. And then the fight is not going to be about necessarily the effects of the law, but about whether that rises to the level of significant interference. The burden would be on the plaintiff challenging it, wouldn't it? If the plaintiff is a national bank challenging a law, then yes, the burden would be on the national bank. Conversely, if, as in this case, the preemption is raised as an affirmative defense, then the burden would still be on the national bank. How do you envision this trial taking place? So that a district judge, let's say in the Southern District of New York, Eastern District of New York, wherever, is going to have a trial to determine the effect of this on all national banks operating in New York? And is that going to involve extensive discovery? Would it involve testimony by experts? If the court makes a decision, what standard of review is going to be applied by the Second Circuit? So we don't think that there are going to be a bunch of mini-trials to determine the preemption question. And I'll just say as a predicate to my response, Justice Alito, I think it's fairly unlikely that a lot of the hypothetical laws that you see at the back of the red brief will ever come to pass because of the nondiscrimination principle that I was talking about. Well, I understand that, but you say in your brief, either in your opening brief or your reply brief, I think it's in your reply brief, you say this may not even require any evidence. This question could be decided without evidence. Really? Well... It's a factual question, or at least it's a heavily factual question. How's it going to be decided without evidence? Well, you'd have to know what the effects are. So that would require some evidence in the typical case, but if it's clear from the face of the statute, if it's just obviously punitive and it's past the point of reasonable people being able to disagree as to whether there's significant interference, then I think that could be decided as a matter of economic logic, which is consistent with what this court has done in other... The matter of economic logic? Well... There's economic logic that tells you whether something substantially affects the operation of commercial enterprise? If you look at page 15 of our reply brief, we identify some cases involving preemption regimes that affect entire industries, airline industry, motor carrier industry, ERISA, you name it, prescription drugs, and it is often the case in those contexts that there is a factual showing that needs to be made, and sometimes this court, included in the Morales decision, for example, has resolved the preemption question even though it turns on significant effect based on economic logic. Now, I think it would be difficult to do that for the ordinary case because we can presume that states aren't going to inflict obviously punitive restrictions on their own banks, and this law would be an example of that, but if a state were crazy enough to do that... I don't think Franklin did this, what you're talking about, and the Supreme Court in Franklin. No, that's right. And Franklin, I think, is kind of our north star here, at least as I've unpacked the case. But I think Franklin, you could either read it as being a case about significant interference based on the record, as I pointed out, or I think what this court said is it just engaged in statutory interpretation. It said we've got a federal statute that says national banks may accept savings deposits, and the word savings matters. It's the label that Congress used for these accounts, and states can't pose a serious practical impediment to that by saying you can't use that same label. And so that case could be understood on statutory construction grounds based on the express statutory power that was granted by the statute, and we have nothing like that here. Thank you, Justice Thomas. Any further? Justice Alito? Well, the way you just described Franklin sounds to me an awful lot like what the Second Circuit did here. They said that the national bank has a certain power, and the state conditions the exercise of that national power on compliance with the state requirement, and that's enough to prove that there's preemption. That's what I just understood you to say. No, Justice Alito. My understanding was... Maybe I misunderstood you. No, I was simply trying to clarify that Franklin National Bank could be understood based on specific statutory text that is nothing like any statutory text the Bank of America has identified. I thought you were saying, and again, correct me if I misunderstood you, but it's important to my thinking about this, that the issue that Franklin Bank can be understood as deciding this issue without examining the empirical question of the extent to which there was an impact on the operation of the bank. I thought that's what you said. I guess I would put it a little bit differently than Justice Alito. I think that the Court, in its opinion, it notes the record that had been amassed on this question as to the practical consequences of the law, and I think that record gave it some comfort and confirmed why it was significant that Congress would have used the statutory term savings. But ultimately, its opinion rests on, you know, a statutory analysis of the word savings and a specific statutory interpretation that would present a sort of... You could think of it as being a conflict in that sense and is nothing like the kind of conflict that we have here. All right. Thank you. Thank you. Justice Sotomayor? The government asked us to vacate and remand and let the Second Circuit apply whatever we say is the correct test. You're asking us to reverse. What's the difference, and why don't we do what the US is recommending? We would be happy with a vacater, and I think it's the most modest way for this Court to decide the question before it. The reason why we're asking for reversal is we think that as long as there's a requirement that the practical effect of the law be examined, that Bank of America has failed to make that showing, and since it's failed to make that showing, then its motion to dismiss should be denied, and it can make the showing at a later stage of litigation or put in some declarations or something and seek summary judgment if it thinks it can meet... I don't know whether I... Statutory... I mean, the statute doesn't speak in terms of practical effects. It talks about preventing or significantly interfering with the exercise of a national bank power. So I do think that there is a difference between practical effect and that language. Well, I think that language in ordinary parlance could only be understood to say that to be able to answer that question, you've got to know what the practical effect of the law is, and you don't have to necessarily know what the degree is. I mean, people can disagree about that, but at a minimum, it's got to take some account of what the practical effect is, and once you recognize that... At what point... You mentioned earlier that the OCC could decide some of these prevention issues, because under your take of this law now, that national banks, all state laws, would apparently apply to national banks unless and until those banks obtain final judgments of preemption state by state, correct? I think that is correct, but... Now, the other side is saying that's an alarming unpredictability, and some of my colleagues are concerned about that. Why don't you address that straight on? But you mentioned in your opening that you thought the OCC could do it. Well, the OCC has done it here. There's a question of whether they've applied the right standard in doing it, but they have done it. Well, the statute... They haven't done it consistent with the procedures set up by the statute, and I don't even think Bank of America is arguing they've done it consistent with the procedures set up by the statute, but I think it would be appropriate for a court on remand to look at what the OCC has said about the effect of this law. You'll find that there's not much there in either the 2011 rulemaking or the 2004 rulemaking or in the amicus brief that the OCC submitted below, but we think it would be appropriate for a court to consider that as part of the analysis. But I would also just... I appreciate the other side's concern about the practical consequences of reading the statute for what it says, and I would just say a couple of things. One is that I think you could, in your opinion, remind lower courts that this is not the only path to preemption. There's the requirement that the law be non-discriminatory, and there's still the requirement that it not pose a square conflict of the sort that it was at issue in Barnett Bank, which covers, prevents. And so then you've got the question of significant interference. You could, you know, point to Anderson and Franklin as we've been discussing, but the OCC has a role to play there too, and the OCC does have expertise, and to the extent that it thinks a particular state law is very troubling and poses a significant interference, it can endeavor to explain why in a rulemaking consistent with the statute, and courts can look at that, and to the extent that it's persuasive, they can defer to it, and that gives the banks the kind of, you know, predictability that they crave. So whether we like the case-by-case approach, the statute requires it. I think I would have expected you to say that to start. We certainly think that you should read the statute and apply it as written. Justice Kagan? Could it be an example of a non-discriminatory state law that would be preempted as a significant interference? I don't know that I can answer that question in the abstract, but, I mean, well, I guess I can. Barnett Bank would be an example. So even if that's non-discriminatory, it poses a clear conflict. Yeah, so you've separated that out as a case that poses a clear conflict. What is the category of that case? Are there cases that fall in other categories that might pass the significant interference test? I guess what I'm asking about is, you know, you say of Bank America's test that it would preempt everything, but one could say about your test that it would preempt basically nothing as long as a statute was indeed non-discriminatory. No, and indeed that was the Treasury Department's proposal that preemption would just turn on whether a state law is discriminatory. And if it wasn't discriminatory, then it wouldn't be preempted. And we know Congress didn't select that regime. So it's got to do some work beyond non-discrimination. I just bring that up to point out that we know that ease of administration wasn't top of mind. Yeah, so what's the work? Give me some statutes. So the statute says prevents or significantly interferes with. We think the word prevents is how you take care of a case like Barnett Bank. It's a square conflict. It prevents the exercise of the power granted by Congress. That can be resolved just with legal briefing. But if you're at the point of substantial or significant interference, rather, that's a question of degree, and it's very difficult to answer that in the abstract. I'd want to know whether there's a federal... you know, what the federal statutory scheme, what the regulatory scheme is, what the OCC has said about it, what the practical on-the-ground impact is, and it's ultimately a judgment call. It's a question of degree, and... You must know a lot about state banking statutes. Is there any state banking statute out there that you think presents a hard question? I don't... nothing comes immediately to mind. But I think, you know, you could imagine if a state were to say you can't have mortgage escrow accounts. Well, of course, that would... as applied to, you know, the covered accounts, it would pose a square conflict with the federal statute. But if you totally disabled states, national banks, from being able to exercise a particular power, that, you know, that's a prevents case. But the question of significant interference is necessarily one of degree, and it's tough to know in the abstract exactly when it would be satisfied. I need to know what the actual on-the-ground impact is and the, you know, the extent to which that significantly interfered with the national bank's exercise of the particular power issue in the case Justice Gorsuch? I think you said it's a judgment call on a matter of degree. Would a 10% state law, would that be significant interference? So if it's non-discriminatory, I'm assuming for purposes of the hypothetical, it would be non-discriminatory, although I think requiring that it be non-discriminatory makes it particularly unlikely that a state would ever do something like that. I understand. But indulging the hypothetical, then it would... we'd be exactly where we are now. It's a question of significant interference, and it would be a question of degree. A judgment call for whom? I guess for us? For the nine of us to just decide? Well, the question of... as to what significant interference means is ultimately a legal question, and it turns on what the actual practical on-the-ground impact is, and if the bank in that scenario could say, look... If it's a judgment call, who's the... we're making the judgment call, or the court... It ultimately would be a legal question, and Justice Alito, you asked earlier about the standard of review. That would be de novo. I mean, to the extent that it rested on factual findings, you know, that would be a different standard. But the ultimate legal question of significant interference is for a court, and ultimately, you know, subject to review by this court. And I guess I'm going to go back to Franklin then and say, well, we're not just doing this. We're not totally at sea when we have to do this under your approach. Franklin says some limits on your advertising and how you describe your product. That is significant interference, and you agree that that's correct? I think that's a way to understand that case, and so if you wanted to give guidance to lower courts, you could use Franklin National Bank as an example, just as the Barnett Bank court did, in its opinion. And I guess here, I mean, maybe this is for a remander for us, but telling a bank not how you describe your product and your advertising, but you actually have to pay money that you wouldn't otherwise pay, I mean, that's much more direct interference with the operations of the bank, it seems to me. Maybe you have an explanation for that. Well, then Bank of America, you know, would be able to, you know, try to carry its burden of establishing that standard. Isn't that just, I mean, you need a trial? That's just common sense, isn't it? To tell someone you have to pay out large sums of money collectively rather than how you describe your product and your advertising. Isn't one more significant interference than the other? I'll take the Franklin side of that question first, if I may. So just to be clear about the law in Franklin, it went well beyond advertising, and it disabled banks from even being able to use the word savings on their deposit slips, anywhere in their bank offices. It just eradicated the word or any of its equivalents from the premises of the bank. And I think, you know, you might think about that as posing a First Amendment problem today. It was also a discriminatory law that gave certain state institutions the ability to use that word, and so it posed a number of distinct problems, but I think ultimately, too, it posed a conflict with the text of the federal statute because the state, in that scenario, thought to significantly interfere with the exercise of express statutory power that Congress granted. The advertising was not an express power. The advertising, the court made clear, was an incidental power. Right, but the power that I think ultimately the court focused on was the express power to accept savings deposits, and in particular, the use of the word savings, I think, was critical to the court's analysis. Right, and here the express power is the lending, and the incidental power is the escrow accounts, correct? The way the Bank of America articulates the power, and we're not disputing their articulation of the power for purposes of, you know, this court's decision, is the power to offer mortgage escrow accounts to consumers. So the question is the extent to which the law significantly interferes with that power. Do you still think McCulloch v. Maryland was correctly decided? Yes, we have no issue with McCulloch. I think there's one way to answer that question. Why is that correctly decided, and that's different? So we point to this in our brief, but there are a couple of key distinctions. So that case involved a tax, a discriminatory tax, on the Second Bank of the United States. And I think at that time, the Second Bank of the United States functioned more like the Federal Reserve Bank, and it had a really public-facing component. And it doesn't, you know, modern national banks don't really resemble the Second Bank of the United States, and the laws that we have in this case are not discriminatory laws. And in any event, it's a question of preemption, and it's ultimately Congress that lays down the standard, and the standard is prevents or significantly interferes with. Thank you. Justice Barrett? Counsel, you're drawing a distinction, which I also saw, excuse me, in your brief, between express powers and incidental powers. Can you just explain to me why that matters? And I'll tell you kind of where I'm going with it or why I'm thinking about it. It almost sounds to me, and correct me if I'm wrong, that you're saying that if a power is expressed, that something more like a control test might apply just as a matter of economic logic, say, but that if it's incidental, and you would characterize this one, I gather, as incidental, that we get into this more fact-specific inquiry. Am I understanding your position? I think you're right to point out that we do underscore the fact that this is an incidental power so that Congress hasn't said anything specific on the subject. And indeed, it's a kind of second-order incidental power that is at issue, which is not just the ability to have the accounts but then, you know, to set the interest rate. And so I think the reason why we're focusing on that is preemption questions typically turn on what Congress says in the text of the statute, and so you want to look at the text of the statute. And this court in Barnett Bank, right before the sentence that articulates the standard as prevents or significantly interferes with, says that the relevant power is the power that, quote, Congress explicitly granted. Now, what's interesting here is the National Bank Act actually expressly grants incidental powers. And so there is an express grant of authority for national banks to engage in incidental powers. But the ultimate question, I think, has to focus on what Congress has said in the text of the statute. Well, I mean, I do agree with that, but you've characterized Barnett Bank a couple times as kind of an express conflict. But Barnett Bank goes out of its way to say we don't have an irreconcilable conflict there. It wasn't the kind of situation where you had the federal statute saying, you know, do X, the state statute saying not X. And so it was about significant interference, and I don't read Barnett Bank to be applying this kind of fact-specific inquiry that you're talking about. So is the difference really just that the statute says something expressed? Well, so in Barnett Bank, you're right that there was an impossibility preemption. So it wasn't impossible for the bank to both comply with the federal statute and the state statute. But the court did say that there was an express conflict based on the text of the statute. And so it really... The irony is Barnett Bank announced the standard which it distilled from this court's cases, but it really didn't have occasion to flesh out the contours of what significant interference means because it involved a complete prohibition. And so... But the court left no indication in its opinion that if the law at issue in that case were less than a complete prohibition, that it would automatically be preempted under the control test. To the contrary, even the bank in Barnett Bank, at oral argument, conceded that a whole bunch of state regulations would be appropriate as to the regulation of insurance, including ensuring that agents of insurance are licensed at the state level. And so I think... I don't read this court's opinion to suggest that practical effects aren't relevant. To the contrary, I think, by using significant interference, the court understood that practical effects would matter, and what it was trying to capture is laws that even if they didn't completely prohibit the exercise of the national bank's powers, they would do something that would raise the same kind of concern in practical effect. And the first case the court cited after it announced that standard was Anderson, which can only be understood as turning on the practical effect of the law. Thanks. Justice Jackson? So I see that the standard significantly interferes in the actual text of the statute, and I'm trying to understand whether this really is sort of an unusual or unworkable assignment for the courts. So can you help me to sort of contemplate how, if at all, this significantly interferes standard is any different from, you know, similar standards in other statutes? So last term in Groff, we looked at a statute that asks whether religious accommodation would impose a, quote, undue hardship on the conduct of the employer's business. RFRA imposes a, quote, substantial burden test. So isn't this sort of in the nature of statutory standards of this kind, and the court looks at them, and we make a decision? Absolutely, Justice Jackson. That's correct. All right. And then with respect to the arduous nature of this and sort of, you know, what has to be proven, I guess I'm wondering, doesn't what is necessary to be established to meet this standard depend on the reason that the bank says the statutory standard is being met in a particular case? So, you know, the bank says, we are pointing to this preemption provision, and we say that what is going on here with this state law significantly interferes with our powers, and then I guess they go on to say how. How is that happening? So when they say this significantly interferes with my powers because it directly conflicts with what the statute says about our authority, which is what I understood was happening in, you know, Barnett, Brookbank, and Franklin, then I guess the court doesn't have to have a bunch of depositions or anything. They're doing sort of a statutory analysis. Is that right? That's right. All right, and when they say, instead this significantly interferes with my power because it imposes an undue burden, I suppose the bank would then be charged by the court with proving that. How burdensome is this? Give me evidence, says the court. Am I right about that? That's correct, yes. And so similarly, if it significantly interferes, if they say it's a significant interference, again, we're in the realm of evidence. And we're doing this on a case-by-case basis because that's what the statute says you have to do. Correct. All right, thank you. Thank you, counsel. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the court. I'd like to make three quick points before taking questions. The first is that the court shouldn't assume that the word significantly, either in the opinion of the court in Barnett Bank or in the statute itself, is devoid of significance. If Congress wanted a statute that said state law is preempted when it forces the bank to deviate in any way from what it would otherwise do, it wouldn't have used the word significantly. It would have used another formulation. Second, in Franklin National Bank, the court didn't suggest that all state law restrictions on national bank advertising were preempted. It emphasized that the word savings was the very word that Congress had used in the statutes to describe the product at issue and that it was the very word that in consumers' minds was most closely linked to the product. And as Mr. Taylor explained at trial, the bank in that case presented extensive evidence that it would be hindered in its ability to obtain savings accounts if it couldn't use that word. And last, I'd say the court should look not only at Franklin, the case the court cited in Barnett Bank, as an example of a preempted statute, but also at Anderson National Bank. And Anderson National Bank involved a state abandoned deposit law. It authorized the state to take over the deposit, force the bank to turn over a deposit to the state upon proof that the account had been inactive for a specified period of time. And it's hard to imagine a more direct interference with the bank's ability to do business than telling the bank, you would prefer to hold the money and earn income on it, but we require you to turn it over to us. But the court explained for various reasons that this would not substantially interfere with the way the bank did business. I welcome the court's questions. Mr. Stewart, is there a difference in the treatment of incidental powers versus the express powers you mentioned in Franklin? I don't think generally. I mean, incidental powers are powers, as you know, that are not enumerated in the statute, and interference with an incidental power can cause indirect harm to the bank's ability to exercise the express power. I would point out that the court in Barnett Bank, in the sentence immediately preceding the one that we've been focused on, said the prior cases, the ones that have found preemption, take the view that normally Congress would not want states to forbid or to impair significantly the exercise of a power that Congress explicitly granted. So it was focusing on express powers there, and it was saying even with respect to express powers, the interference has to be... the impairment has to be significant. The control test doesn't apply to express powers. So I don't think there's a meaningful difference. Counsel, do you agree with your friend that determining whether something is significant would be something you can do without trial evidence? I mean, certainly if the OCC were doing it, it would have kind of a preexisting body of information about the way the national banks operate, and it might be able to draw on that font of experience in determining whether restrictions that might seem innocuous to a layperson could in fact predictably have a significant adverse effect on the bank's business. I think Mr. Taylor was also alluding to the court's decision in Morales which involved the Airline Deregulation Act, in which the court explained how the state false advertising law would impair the airline's ability to engage in the pricing practices that they wanted to engage in. And the court didn't make quite clear exactly where the information about the pricing practices came from, but it didn't appear to come from a trial record. So there may be kind of sources of information other than trial evidence that would allow the court... That raises a question for me, because like the Chief Justice, I was wondering what could the OCC do here, and you alluded to that. It's interesting, I'm not sure what to make of this, but in the 13 years or so since Dodd-Frank, we don't have an OCCA rule on escrow accounts except for the one issued in 2011, immediately after Dodd-Frank, in which it reaffirmed its rule banning, as I understand it, any regulation by states on escrow accounts under an obstruct or impair standard that predated Dodd-Frank. It purported to ratify what it had done before under the old law. And as I took it from a couple of cryptic footnotes in your brief, you're not asking us to defer to that regulation. In fact, you seem to suggest that it's inconsistent with the law and entitled to no respect. Why hasn't the OCC done something here under the law that actually exists? Well, the OCC did file an amicus brief in the Second Circuit taking the other way, and so that was what they did. Now, you seem to have disavowed everything the OCC has done since Dodd-Frank. What do we do with that? Well, I think there are substantial indications in the text and history of Dodd-Frank that although Congress intended to codify the Barnett Bank standard, it intended to revise or overturn the way that the OCC had been making preemptions. And the OCC said, maybe you thought so, but ha! We promulgated it before Dodd-Frank, so you're stuck with it. And now you're saying, no, that's not right. And is the OCC going to actually do some of this work at some point under the law? As far as I'm aware, the OCC has never issued a case-by-case preemption determination, and I don't know what the reason is, but I would say, if you imagine the OCC trying to do a case-by-case preemption determination with respect to the New York law at issue here, the most straightforward way to do it would simply be to say, we have a regulation that says states can't regulate mortgage escrow accounts, this is a regulation of mortgage escrow accounts, therefore it's preempted. But if the OCC tried to do it that way, it would run into the provisions of Dodd-Frank that say when the OCC does these determinations, it considers the impact of the state law. In fact, we have exactly the regulations that say if they did this, they did it. They said there are no escrow regulations that are permissible under state law, they're all preempted. But you're not defending that regulation, you're disavowing it, you've flip-flopped positions on it. And I'm asking, is the OCC ever going to get around to doing that which Dodd-Frank directs it to do? Well, I think I would say Dodd-Frank authorizes, but doesn't direct it to do this. Now, if the petitioner's position in this case prevails, and if the court holds that some inquiry into practical impacts is necessary with respect to the individual state law, then it's very possible that the OCC will start making these case-by-case determinations because independent of legal expertise, the OCC has expertise in the way that national banks operate and can bring that expertise to bear in determining... I think there are two or three reasons. The first is that, as I say, we think that the text of Dodd-Frank manifests a disapproval by Congress of the way that OCC had been doing these determinations. The text says case-by-case determinations, and it's really the opposite of an OCC rule that says here are many categories of state laws that can't be enforced at all. Even though the key members said otherwise. They were not the key members. They were two members of the Senate who had drafted the Senate version of the... I shouldn't have used the, but key members. I shouldn't have used the word the. They had drafted the Senate version of the preemption provision, and the Senate version contained a general reference to the legal standard in Barnett Bank but didn't use the phrase prevents or significantly interferes with. And then the House bill had framed the preemption standard as does the state law prevent... I interrupted you. Keep going with why you changed positions. So one's you're reading the text in history. They indicate that Congress wanted the OCC to redo this. I think the second thing that we would say is the way in which OCC's view is currently manifested is in the 2011 regulations. But Congress said the way that OCC is supposed to do preemption determinations going forward is through case-by-case determinations. And historically, it's been a requirement for deference that the agency act through the procedural mechanism that Congress specified. The third thing is Congress said even when the OCC does case-by-case determinations, it only gets Skidmore deference. It doesn't use the word Skidmore, but it basically tracks language from Skidmore. And then it says nothing in the preceding subparagraph alters the deference that OCC gets for any other type of determination. And so it seemed clear that Congress was happy with the way that OCC had been doing things in all respects other than preemption, but not with the way it had been doing... Mr. Stewart, do you have a view on whether this New York statute constitutes a significant interference with national banking powers? We don't have a concluded view. Certainly, as Mr. Taylor points out, this is something that state banks have been complying with, apparently without material impairment. I think it would depend in part on evidence or a factual showing about what rate of interest can the banks use on the money in the escrow account because... Can I interpret that? May I? Sure. Can I interpret that as suggesting that you're skeptical that it's a significant interference? Yes. Okay. Justice Thomas, anything further? Justice Alito? Well, suppose the OCC doesn't act, and suppose a bank says that, requiring us to pay 2% interest or whatever rate of interest is involved in the particular case, costs us this amount of money, and if we have to pay this additional amount of money in interest, then we're not going to be able to... do this or that. How would a court determine whether that is significant? I mean, I think it... I would hearken back to the point that Justice Jackson was making that there are many standards in the law that require this sort... and they're imprecise, but I think the court would ask how significant is the other thing that the bank says it wouldn't be able to do? Well, I mean, most of those... I can't remember the whole list. Most of those did not involve economic determinations. I mean, certainly, as Mr. Taylor points out, it can't be sufficient that a state law would require the bank to spend some amount of money on something. I'd point out, in fact, that federal law... Could you... Can you quantify significant interference? I just don't... You know, maybe this... ruling the way you want us to rule will not cause any problems at all, but I'd appreciate it if you would talk about the argument that this will cause a lot of problems. There's the imprecision of the significant interference standard. It does seem to have a very strong factual component. I find it hard to understand how an empirical question like that can be decided without evidence, which would require discovery and perhaps testimony by experts. It would require individual district court judges to make the kind of... I mean, certainly when the OCC does this, they can call on a lot of economic expertise and knowledge of the banking industry. Every district judge in the country is potentially going to have to make the same kind of determination. And then there's the problem that these cases are going to be decided on an individual record. So suppose these petitioners lose on this record. Would that ban others who have non-interest-bearing accounts with the Bank of America from bringing suit and saying we can compile a better record? And then you have questions about the same issue being decided in different circuits. What if other states require 2% interest and the Second Circuit says one thing and the Fifth Circuit or the Tenth Circuit or whatever says something else and then you have issues of collateral estoppel? It just seems like a complicated situation. But you are able to assess the whole thing. So just explain why this would not cause practical nightmares. I guess for two reasons. The first is that administration of standards like this is routine in the law and the banks obviously have access to a lot of information that I don't have access to about the ways in which particular state laws would affect their operations. The Flagstar amicus brief has a fairly intricate argument about how these sorts of laws would impair its ability to securitize loans and so forth. But the second thing I would say, and Mr. Taylor alluded to this, is we also have non-discrimination as a backstop and that gets rid of the horribles, that gets rid of the extreme cases. In some instances, taxation for instance, under current federal law, states can tax national banks so long as they do it on a non-discriminatory basis. The Cord and Barnett Bank pointed out that national banks can operate branches only to the extent that it's permissible for states. I understand that. But all you said about the question, let's put non-discrimination off the table because that's not what's at issue. All you've said is that there are other statutes that impose a similar burden on the court. And the one I remember from Justice Jackson's question is the undue burden standard in Title VII. That's quite a bit different. Do you have any that are closer to this? Economic determinations? I don't really, other than the ones that Mr. Taylor was alluding to that involve cases citing in his reply brief or often under statutes like the Airline Deregulation Act. There's a core of things that are clearly preempted, but then when you decide where does the boundary of preemption lie, you're looking at practical impacts. Thank you. Justice O'Meara? I understand my colleagues, some of my colleagues' concerns about this case-by-case approach. But I go back to the text, which is the text permits the states to do this and says unless, and it's the unless that's creating this problem, but the presumption is that there's no preemption, correct? That's correct. And the point I was making about discrimination is even if you assume kind of the worst-case scenario, that this all becomes so complicated that banks decide it's just not worth trying to establish preemption under prevents or significantly interferes with, they're still left with substantial protection against discriminatory laws, which in other aspects- Can we go to inherent in Justice Kavanaugh's earlier question of co-counsel? And he said you're costing the banks money, and that's a greater burden than it was in Franklin. Now you point out Anderson, which it costs them money too. So do you have an argument as to why his saying that Franklin sets a sort of maximum or a minimum is a wrong way to look at this? Well, Franklin didn't cost the bank money in the sense of forcing it to make outlays, but it cost the bank money in the sense of making it more difficult for the bank to attract customers and thereby earn money on the accounts. That is, the bank officers testified it was more difficult to get consumers to sign up for savings accounts if you couldn't use the word savings in your pitch. They had consumer surveys that showed that consumers were more likely to recognize the word savings. No, I understand that. And so I think it would be, for these purposes, an artificial distinction to draw a line between state laws that require the state to lay out money and state laws that simply make it more difficult for the state to earn money. So then answer why it's not a significant interference or how do you measure that when it's costing the bank money? I mean, one thing you would want to look at is to what extent could the bank earn money on the escrow account and what relationship would that potential earning have to the interest it was required to pay out? Because when people defend the use of escrow accounts in this setting, it's never on the ground that it's a good way for banks to earn a little money. It's on the ground that it protects the bank's collateral against the possibility of failure to pay taxes, failure to maintain insurance, and escrow accounts are very useful for those purposes. So, in essence, you're almost saying this would be an easy case to prove. If they can earn 5% and they just have to give up 2%, there's no substantial interference. There's no cost. That would certainly be right. If they can't earn any money on this money and they have to pay out, that might be. Yes. Then you're at least trying to determine whether that mandatory outlay is significant. Okay. Justice Kagan? Mr. Stewart, it might be that you have text on your side, but before we get to that question, I guess I'm interested in many of the inquiries that Justice Alito was making, and I'll just come at it in a slightly different way. Yes, significant tests are common in the law, but they're not really common in preemption inquiries. We don't really see a whole lot of preemption inquiries where we have to do this question of, like, how much is too much? And one reason we don't is you need an answer that applies everywhere and for all time. I mean, significant effects. You could have no significant effect now, and then 10 years from now, you're in a different economic environment and you could have a significant effect. And does that mean it would be a kind of on-off switch, like one day the law applies and the next day, 10 years later, it doesn't? So add to Justice Alito's question about maybe different parties would present different records. Maybe different states would have the exact same law, but the economic circumstances in those two states would be very different, so it looks as though the federal law preempts one state law and doesn't preempt the other state law. It seems an odd kind of inquiry for a preemption question. I guess the first thing I would say is, and I'd point the court to the cases cited at the back end of Mr. Taylor's reply brief that talk about statutes like the Airline Deregulation Act, which preempts state laws relating to rates, routes, and services. And if you have a state law that specifies what rates or routes or services the airline can use, that's an easy case. That's preempted without regard to practical impacts. But the court has also recognized sometimes states will regulate something else, but the regulation of something else will have a predictable spillover effect on the airline's ability to pursue the rates, routes, and services that they want. And it's in those cases at the order of preemption where the courts have been forced into pragmatic inquiries. And as I say, the second point I would make about the text is, there were other formulations Congress could have chosen. Some statutes refer to... Yeah, I guess you're not giving me a whole lot of comfort in this about how peculiar this would be, that we could have different rules in different states, we could have different rules depending on the time that the challenge is brought. I think that's, A, something that Congress signed up for, but, B, it's really a benefit to the banks. That is, if Congress had prized ease of administration above all else, it could simply have rested on the anti-discrimination prong, as it has with respect to other aspects of national bank operations. And by adding prong B of the preemption standard, Congress is giving an additional opportunity to the banks to say, even though the states are doing this to their own state charter banks as well, it will significantly impair our operations. They can invoke it or not invoke it as they want, but it's an additional opportunity for the banks. Thank you. Justice Gorsuch. Justice Kavanaugh. On Barnett, the statutory text directs us to Barnett, so I've been trying to parse Barnett even more than usual, and I have a question about the two paragraphs after the articulation of the standard, the court in Barnett said, where Congress has not expressly conditioned the grant of power upon a grant of state permission, the court has ordinarily found that no such condition applies. Then it says in Franklin National Bank, the court made this point explicit. The federal statute before us, as in Franklin National Bank, explicitly grants a national bank an authorization, permission, or power. It contains no indication that Congress intended to subject that power to local restriction. How do you interpret those? I'm sorry, I have the pages here, but can you say that? Well, I'll say the last sentence again. And as in Franklin National Bank, it contains no indication that Congress intended to subject that power to local restriction. Thus, I'll give you one more sentence. Thus, the court's discussion in Franklin, the holding of that case, and the other precedent we've cited above, strongly argue for a similar interpretation here, a broad interpretation of the word may that does not condition federal permission upon that of the state. Yes, I think the court there was referring to one of the arguments that Florida made in the case. And as Mr. Taylor was pointing out, the conflict in Franklin was very stark. The federal statute said national banks may sell insurance in small towns. The state statute said that you can't. And perhaps out of desperation, the state argued that, well, when the federal statute says national banks may sell insurance in small towns, it only means they may do this if state law allows it. And the court said that's not the way we usually understand federal authorizations to work, that ordinarily if the National Bank Act says you can do something and state law says you can't, the federal statute controls. Two more questions. Apologies. To follow up on what Justice Gorsuch said, Dodd-Frank does explicitly require payment of interest for certain kinds of escrow accounts. Given the OCC history and Congress's involvement, Congress explicitly requiring that for certain kinds would suggest something else for these. How do you respond to that? The statute says that for these mandatory accounts, accounts that are mandated by TILA, the bank must pay interest under applicable state or federal law. And so there's a question about what applicable means. And certainly with respect to applicable federal law, it would mean you'd have to point to some other federal statute that required interest to be paid on the escrow accounts. I think one natural reading of that provision would be it doesn't establish a special rule for TILA account, TILA-mandated accounts. It just says if you would be required to pay interest on this account were it voluntarily created, you have to do it at this time. Last question. You said earlier, I think, the banks could do this without material impairment. I think you predicted that. Yes. I mean, we certainly have not seen anything up to this point that suggests that a bank could not pay this rate. It's higher cost, therefore, decreasing the availability of credit or higher rates that they charge. Is that material impairment or not, and how do we assess that? I mean, certainly out-of-pocket expense in and of itself wouldn't be sufficient. But they would have to not just assert but make a showing that this would be a deterrent to their offer, a meaningful practical deterrent to their offering other services. Thank you. Justice Barrett. Mr. Stewart, do you understand case-by-case basis to refer to bank-by-bank basis or to statute-by-statute basis? Statute-by-statute basis. And the statute says the OCC can extend its inquiry beyond the specific state statute to a substantively equivalent state law. And so that, in our view, reinforces the sense that it's statute-by-statute, not case-by-case, but bank-by-bank. And do you think that this language, case-by-case, I'm just looking in the statute, do you think it is designed to say something about how courts conduct the preemption inquiry, as in this case because it was brought by court versus the comptroller of the currency? Because I'm just looking at the way that it's structured. It says any preemption determination under this paragraph may be made by a court, comma, or by regulation or order of the comptroller of the currency on a case-by-case basis, comma, and then all of the subsequent references to case-by-case basis refer to the OCC determination. And I'm just asking, should I make anything of that? I think, I mean, the two things you should make of it are, first, yes, it is directed just to the OCC, and it seems to have been a reaction to the 2004 OCC regulations, which declared kind of broad categories of state law to be off the table. And Congress was saying, don't do it that way. Focus on the impacts of a particular state law. Totally agree, which is how I read it. So I'm wondering how much it just seems to me. I'll try to get to the point of why I'm wondering about it. It seems like, you know, that phrase case-by-case basis itself sounds fact-laden, like we're making factual determinations on a case-by-case basis. But if that language, case-by-case basis, was designed to stop the OCC from doing what you're saying, does it really carry that implication here? Well, I mean, under Article III case or controversy principles, the courts are already going to be subject to a case-by-case basis. And the most relevant language in that provision is that in making a case-by-case determination, the OCC must consider the impact of the particular state law. And that seems clearly to refer to the practical impact. And if that's part of the substantive inquiry, then even though the same case-by-case requirement wouldn't apply to a court, the court should consider impact as well. So do you think the court then is bound, even though B-3 is referring to the comptroller, do you think the court should be implying the exact same standard? I mean, the court is certainly bound by the same substantive standard. If you look at B-1... Well, B-1, A, B, and C, of course. But I took you to be referring to three case-by-case basis definitions moving forward. No, I wouldn't. Again, the court will be naturally looking at a particular state law just because that's what courts do. Congress didn't have to worry that courts would kind of announce broad lists of things that couldn't be regulated. And so the court should still consider the impact, the practical impact, but it's not otherwise bound by the procedural requirements. Of course. So it just seems to me then that the court... I guess what I'm saying is I'm not sure how much all the talk about case-by-case basis does for this question of whether this is primary or legal or factual inquiry for a court. I certainly would agree that the ultimate inquiry has both factual and legal components. That is, you have to know the facts, but you also have to make a legal determination, do these facts amount to significant interference? Thanks. Justice Jackson? So going back to Justice Alito's question, is there a reason why national banks can't be subjected to the same kinds of evidentiary standards that other plaintiffs have to satisfy when they're making legal claims? No. I mean, national banks... And because we are talking about not the effect that this would have on somebody else, but the effect it would have on the national banks themselves, not only do they have the wherewithal to satisfy these requirements, but they're in the best position to have the relevant information. And they have the wherewithal in part because there's nothing that prevents national banks from hiring lawyers and gathering evidence and presenting them to the court, right? Right. And is there something about economic questions that are not within the competency of the court? No, and I would... I'm sorry? I mean, doesn't the court litigate issues in the realm of economic regulation all the time? Sure. And so I guess I'm wondering, is the showing here really any different than the other standards that I'm talking about? So, for example, I mentioned the undue burden standard in the Title VII scenario. I mean, it would seem to me that the showing that a company employer would have to make in Title VII regarding undue burden on its business when accommodating religious employers is really no different in kind... Religious employees, excuse me, is really no different in kind than the kind of thing a national bank would have to show if it says this is substantially interfering with my powers. All right. So let me ask you about how often such a showing would have to necessarily be made. Did I understand you to say that the preemption determination always requires an evidentiary showing? I think you kind of discussed that, but aren't there circumstances in which a big evidentiary showing wouldn't be necessary? Yes. I mean, there certainly could be cases in which the nature of the restriction has such an obvious impact on the bank that you wouldn't need at least any... An obvious impact, for example, like it's directly conflicting with what Congress says about the bank's powers. That would be one example. Another example would just be like charging... The bank has to pay 15% or 20% interest rate. Now, as Mr. Taylor pointed out, that's not going to happen in the real world because states are not going to impose restrictions like that on their own state charter banks, and so the nondiscrimination requirement will take off the table a lot of the most extreme... So this isn't going to... The big evidentiary showing problem is not going to happen in every case in which the bank is making a claim about preemption. That's correct. And I'd also point out the bank, to the extent, at least, that it's worried about enforcement by state officials, it doesn't have to wait to be sued. That is, Barnett Bank was a case in which the bank went into court itself and sought a declaratory judgment of preemption, and that would be available. Bringing its evidence and its lawyers and that sort of thing. Yes. Finally, with respect to Justice Kagan's question, I guess I'm wondering what, if anything, we can do about the oddity of the standard in this context. It's in the statute. And so I don't know whether we can just read the statute to say something other than it says because we think this is odd to have it here. I mean, we certainly agree that you can read the statutory language in light of the Barnett Bank opinion, because both because the statute... That tells you you're supposed to do that. Both by drawing specific language from Barnett Bank and by including a separate citation to Barnett Bank itself. But I don't think the court can get away from the fact that Congress chose this particular formulation as its distillation of the Barnett Bank opinion. And that's because, as you said in the beginning, significantly effect means something, right? That Congress has actually used another formulation if it just wants preemption regarding any law that relates to this, right? They say that in ERISA, for example. It says it's preempted if it relates. Yes. And so that's easy to apply, but here they didn't say that. Yes. And some preemption provisions say a state can't enforce a law that is different from or in addition to the requirements of federal law, meaning a state can attach additional consequences to a conduct that already violates federal law but can't go beyond that. And it didn't choose anything like that here. Thank you. Thank you, Counsel. Thank you. Ms. Blatt? Thank you, Mr. Chief Justice, and may it please the Court. New York law significantly interferes with the exercise of national banking powers in two respects. First, the law controls the interest rate on mortgage accounts, and second, a patchwork of 50 of these state laws would unduly burden national banks, destroying their uniform federal character. Now, the other side posits that significantly interferes requires factual proof that a state law would hinder a banking power to some unspecified degree. But significantly interferes can be both quantitative and qualitative. And a state law that dictates the attributes of a banking product interferes with national banking power in a qualitative effect, just as courts telling prosecutors what charges to bring would significantly interfere with executive power. Barnett Bank uses the term significantly interferes in a qualitative sense. Barnett Bank reasons that state laws are preempted absent any indication that Congress intended to subject the banking power to local conditions. And here we know Congress intended the opposite. First, Congress, excuse me, federal law comprehensively regulates state mortgage escrow accounts in order to protect consumers without requiring any interest. And second, Congress speaks expressly when it contemplates state interest laws. It did so for state usury laws, and Dodd-Frank itself requires interest on certain mortgage escrow loans but not petitioners. It is unfathomable that Congress intended the other side's test. They never told you what interest rate would be too much, what to do when market forces change, and how courts should proceed bank by bank. But national banks need to know their regulatory obligations ahead of time. It would create seismic uncertainty if the laws of 50 states could apply to every banking product and service, and not just every feature of a mortgage but everything from interest rates on savings and checking accounts to ATM fees to credit card reward programs. Congress surely intended a preemption standard that preserves the stability and predictability that undergirds a safe and sound banking system. Welcome questions. Ms. Blatt, do we treat express banking powers the same as incidental banking powers? It would seem that you would have to somehow have a way to fathom what these incidental powers are. Right. No. There's enumerated powers in the 7th of 12 U.S.C. 24, and incidental powers are defined as necessary powers to the business of banking. And I can't think of them more, so the only enumerated ones are basically lend money, take deposits, and then make real estate loans in 371. What interest you charge is so fundamental to a banking product and the banking power that it would seem absurd to say a state could dictate the interest rate on something like a savings account just because that's an incidental power. Well, I agree with you on that. In Franklin, though, I think it was statutory. It was expressed. But what I'm more interested in is the creation of an escrow account than interest rate on the escrow account, which is not sort of something the bank would normally have to do. That's correct. I mean, 13 state laws require it. Since 1973, I guess, we've had the Real Estate Settlement Practice Act that never required interest. It's got 40,000 words of regulation, 17 interpretive statements, and 10 appendices regulating escrow accounts in federal law. None of it requires interest. I think the other side would think states now could make amendments to every single one of those requirements, and somehow banks would have to run and get declaratory judgment as to each and every requirement just on escrows. And then when you cascade that across everything a bank does, it is mind-boggling. It is mind-boggling how many products and services national banks do. And I'm not sure why we're talking about God and the airlines in a national banking case when we have 150 years of precedent that culminates in Barnett Bank. And you have 30 words of text. You basically have Congress writing you a love letter saying, we really like your Barnett Bank decision, and then it talks about the significant prevents or significantly interfere. And Barnett Bank itself five times cites Franklin, and five times says what we mean by that is we look to see if there's some indication that Congress wanted to subject the power of national banks to local conditions. I'm sorry. There are, Mekhi, in the logic of the Second Circuit law, would suggest in your test, in the Second Circuit's test, that no state consumer law would be permitted. But there's an express permission for state consumer laws. So which ones are you going to say are okay? All of them cost the bank money, whether it's giving a disclosure form or a notice form, everything costs money. So what's incidental? That somehow wouldn't be preempted under the Second Circuit test. Sure. Let me tell you. So the definition of state consumer financial law versus the law that's preempted under our test focuses on what is being controlled. It's not simply state regulating. Of course states are regulating, but what is being controlled? Is it the national banking power, or is it the financial transaction  And when a state dictates... I'm sorry. What's not controlling the financial transaction of the consumer here? I'm going to give you both the definition and a laundry list of state law. The definition is this. When the state dictates the attribute of the product and service, as opposed to the interaction with the consumer, it's preempted. And under that definition, you have banking-specific laws that aren't preempted, like laws that prohibit racial discrimination and whatnot. You have laws that prohibit fraud by banks. And most importantly, you have the banking-specific escheat law in Anderson. That's their leading case, and yet I think it's our best case. The court said that what the state did, the banking-specific law, that it only changed the identity of the account holder who had the lawful right to demand payment, i.e., the deposit account. But then five times in the opinion, the court said you are not, the state law is not, and I'm going to quote because they rely on it, not an unlawful encroachment on the rights and privileges of national banks. It's not infringing or interfering with any author rights function of the bank. It's not a denial of its privileges as a federal instrumentality, and so on. The other categories of laws that are not preempted that meet the definition of state consumer financial law are all generally applicable laws that regulate the manner and terms of the financial transaction with the consumer. So every state law has a law of majority. When you can buy a mortgage, it's usually 18. Alabama, it's 21. All states have laws about when the statute of frauds kicks in, on what type of contracts, and it's not like I'm here making something up. The National Bank Act was passed in 1864. In 1870, your first case that said state law has room to play on the dual banking system said state contract law controls, and then you've had case after case making a dividing line between protecting the banking power at issue, these federally authorized confers powers, and on the one hand, and state law where it can creep in when you're talking about the interaction of transactions with consumers. But aren't the national banks interacting with consumers pursuant to their power? So why don't those two categories collapse? They don't because in 1870, you said they didn't. You said there's no federal common law of contracts. There's no federal common law of torts. The court said in their daily lives, banks can be regulated more by states than the federal law because the states have to supply state contract law, tort law. Well, speaking of what we said, you mentioned the Anderson case. I read that case to be about whether or not state laws, quote, impose an undue burden on the performance of the bank's functions. So, I mean, yes, you picked out some language that suggests that this is about sort of power at some level of generality, but it seemed to me that this was about whether the law at issue in that case was, quote, so burdensome, end quote, as to be inapplicable. It wasn't about the nature. It was about, as Angela said, the degree. I think you're absolutely correct. And Anderson, and when it contrasts the California case, is talking about an undue burden because it didn't affect the power. And what the court said, and that's why we have two tests. We have a fallback test. One is if it affects the national banking power and controls the attribute of the product, preempted, preempted, preempted. There is a second undue burden test that looks at the practical impact, but the delta between the two sides is we think that can be as a matter of law and looks at a patchwork across 50 states. The California case said it was preempted without any factual record. In Anderson, it said it wasn't preempted with any factual record. They say with no case, not one case in 150 years of precedent, would this court look to a factual record? They're relying on some trial court record? That's their best case? When the Supreme Court didn't even talk about it? I think that pretty much tells you all you need to know whether Congress intended a factual record for banking preemption. Now, on the OCC, I think, you know, there are three reasons why it is just simply implausible that by codifying Barnett Bank, Congress tended to overrule it or somehow upset it. And the first is what I already mentioned, the 30 words of text that says you need to follow Barnett Bank. And the second is there is a specific provision in 25 BC, we rely on it, the OCC relies on it, that says OCC must follow the legal standard of Barnett Bank without any reference to the prevents or significantly interferes. So they can't possibly mean two separate things. Congress told OCC to follow Barnett Bank. Not to look at significant effect. And the third reason we think it's just completely doubly bizarre and backwards that you would take Congress being mad at the OCC and imposing procedural requirements and somehow they intended to impose a new substantive standard on courts. When they weren't mad at you, they weren't mad at courts. And impose a standard that no one's ever heard of or applied before that you would go fact by fact, fact by fact, law by law, bank by bank. And he did a little fancy footwork when you said, well, would this proceed bank by bank? He answered by saying, well, that would be the OCC. He never told you what would happen with Justice Alito's question about what would happen if Bank of America couldn't prove it but another national bank, Citibank, could do it. There's no answer to that. And in terms of the impact, the notion that Mr. Stewart speaking on behalf not of the OCC but the Justice Department, that you just have to look sort of at the records of the bank. The biggest problem with something like interest rates, which makes this a very easy case, is today 2% is four times the national savings. At the time of Mr. Quintero's, it was 33% times the national savings rate. And, excuse me, that's Mr. Himes. At the time of Mr. Quintero, it's ten times. I don't know what you think. Maybe you should let the courts know. Let's look at ATM fees. $4 sounds, I don't know, maybe $1.50. And then we can go to credit card reward programs. We'd have to have a consumer survey. I think I'd like 2% back on my credit card, but maybe states say it has to be 4%. And I just don't even know how they would do this in terms of what the impact is. Banks are in the business of money, so the impact is not just the potential for confusion and duplication and inconsistency and the sheer 50 state regulators that you'd have to contend with and the laws are constantly changing. But most things with banks, if you take it out of one hand, it comes out another. And when Congress studied this in 1973, they said— I thought all the national banks were pretty much the same in terms of their powers. Like I thought we were talking about what a state law is doing to the national bank power. So it's not at the level of a particular bank. And any of the banks could make the argument. And once they do, it would come up to the Supreme Court, and we would decide ultimately, right? Well, that's the case. The Second Circuit said a mortgage escrow account is a direct assault on national bank power. I guess I just don't understand why it's so hard. I don't think it is hard. No, no, no. What I'm saying is you're making the argument that it is really going to be very challenging for banks if we rule against you in this case. And I don't understand why that's the case. Well, you have since the Reagan administration a former OCC controller telling you it would create seismic sea change and uncertainty. So that's the view of controllers from Reagan to all the way with Biden officials. You haven't even heard from the OCC, which regulates the national banking system. That alone should scare you tremendously, that you don't even have the OCC up here. In terms of how hard it would be, I don't think I've heard a satisfactory answer on what interest rate would be too much and how national banks could make that showing. But take just interest rates on savings accounts. I don't even know what the banks would say. They would say, well, we can do it. Don't you have to say something? It's your burden. You have the burden in the law to show this substantially interferes. If your answer is, I don't know what we would show, then I guess you lose. Not if 150 years of case law is relevant and Barnett Bank codified it, because in no case has a bank, the Supreme Court ever say, well, where's your facts, bank? Franklin itself is the best case on point. And I also think it's significant that the court in Waters, that's the Supreme Court. I mean, that's actually you. You read Barnett Bank and had the most sweeping language you could possibly have about what Barnett Bank meant. And it said states cannot control banks, period. That's the Supreme Court. That interpreted Barnett Bank. So, you know, and that's why I think OCC has always taken this position. Because I looked at it. It says the states can exercise no control over national banks, nor in any way affect their operation, except insofar as Congress may see proper to permit. For sure. And that's what the whole issue is. How far did Congress permit here? Well, two solicitor generals said in briefs before you what I said. So I'm happy standing on OSG's view across several administrations about what Barnett Bank means. I'm fine with that. The state statutes have to be nondiscriminatory. Correct. So, you know, one way you could look at this is if a state statute is nondiscriminatory, how much damage could it really be doing? And I think that's part of the problem, which is what the Franklin case illustrates and what this case illustrates is the plaintiffs will always say, well, you applied it to your state banks, so what's the problem? That's the question. I mean, it seems as though there should be a kind of presumption that if the state is doing it for the state banks, it's not really interfering with bank powers in a way that we should care about. There might be exceptions to that, and that's what the language is designed to accomplish, is, you know, to pick the exceptions to that where something has gone kerfooey, such that even a nondiscriminatory law does something special to national banks. So two responses. I think Franklin would have come out the other way because there was the New York Court of Appeals said there's not a sufficient showing. But more importantly, and this I think goes to the congressional design of the National Bank Act, is that they're supposed to be, you know, why have your name Bank of America if you look like Bank of Ocean City or Bank of Hawaii? You're supposed to be able to walk into Bank of America and get one product and not have 50 products in 50 states, and every time a state says change your escrow, you have to change another aspect of your origination. I totally get that impulse that national banks don't want to have to deal with patchwork state laws, but the presumption, the baseline that Congress said is it's not preempted unless discrimination or you can prove significant impact. So we can't take that argument very seriously, that it's just too much of an impairment on national banks. They have to deal with reality that we live in a federal system with 50 states. Yeah, I mean, it just seems like you're kind of reading the provision, I mean, upside down. You could read Barnett Bank the same way and say this court has... You could say upside down, but that's what the statute said. You could say 150 years of case law says states can regulate unless there's a... Well, that's what Congress said, right? I agree, and I think that the court said it's preempted under Barnett Bank if it prevents or significantly interferes, and then you go to Barnett Bank and it tells you, I think, five times that we read it in light of Franklin. You mentioned earlier that you thought state lending laws with respect to race, religion, and others are not preempted. Why? On your view, if states don't get a role and you really... Barnett Bank should be inverting the statute and the presumption is national banks operate free of state control. That would seem to subsume those laws, too. So, no, for this fundamental reason, and that is that states have... Sorry, national banks have no power whatsoever to discriminate on the basis of race or to commit fraud, and this court in the 1924 case of First National Bank v. Missouri said, when it said that state law that bans national banks from having bank branches, the court said it can't preempt it because there's no either... So I think the OTC has correctly taken the view since 2004 that there is no... There's simply no power to... But if I understand... Phil, please. If I understand your test correctly, you're looking to see whether a state is conditioning the exercise of a national bank power. And for sure, that's what fair lending laws do. It says, you know, you can't make the loan decisions that you want to make except conditioned on your satisfying sub-state law. A lot of state laws can be explained in just that way, and that's... I think that that's the test you use in your brief. Yeah, but... Fair lending laws are a condition on a national bank's power. But so is a law that says you can't lend a mortgage to a two-year-old. That's conditioning the bank's power on, you know, making sure the person is 18. But those laws aren't preempted, and I think the useful dividing line is are you changing the attributes of the product of service? Absolutely you are. You're saying I'm not... You have to lend to people you don't want to lend to. But that's the same way with a four-year-old. But if I could just get... A four-year-old, a 24-year-old, whatever. But there's no... And just a second, Counselor. There are going to be a patchwork of states with different judgments, and you're going to disagree with some of them. And all of them have to do with the core banking powers of who you may lend to, who you may open an account for, what interest you can charge, and all of that. And, you know, it seems to me, not to put too fine a point on it, but there's a bit of wanting your cake and eating it, too, here. No, because we're happy with, again, your precedent. The President has been very careful to make sure that states can go right up to the line, and I think Anderson says that. You can talk about, you know, you can interact with the account holder and the bank and things like contract law, age requirements, statute of frauds. And if I can get back to discriminatory lending, banks don't have any power to discriminate on the basis of race, gender, sex, sexual orientation. But they sure have to discriminate on the basis of income status. So, yes, if the state law said you can't discriminate on the basis of income, that's going to be preempted because there's a federal duty to mitigating at risk. But this is, again, and the same way with fraud, I don't think state lending laws that prohibit fraud in lending are preempted either. They just have never been. You can discriminate on the basis of income but not race. How about, like, redlining neighborhoods and things like that? Disparate impact, I mean, that's extremely heavily regulated by federal law. But I'm asking about nondiscriminatory state laws, then what? I don't think any states have argued, sorry, national banks have argued disparate impact laws are preempted because they're so... But under your test, why wouldn't they? Well, I mean, we can talk about the theory behind disparate impact probably, but I think it's one of those areas on how you consider, how you look at disparate impact. You might argue those are preempted under your test. I don't think so, but even if they did, it's still the line that we're drawing is the line this court has drawn, I think, since Anderson. And before that, that if you're not changing the attribute, and I don't think it changes the loan attribute to say, is the person black or white or green? It's still a loan with the same interest rate, the same term. If you say state law says, I don't want national banks paying less than 2% or 3% or 4% on savings accounts, or no mortgage loans that are under 29 months and 10 months, it's just the product. That is literally the product, and I think we talked about the credit cards and the ATM fees, how much cash you can withdraw. How much cash you can withdraw has nothing to do with the consumer walking in. It literally is the core banking service itself. And this has been the workable standard. This has been the settled expectation. And whether or not you have to pay interest on the escrow account does or does not have something to do with the consumer walking in. Nothing. It's the nature of the product. It's the interest rate on the loan. It's no different than there's plenty of state laws that control things like the term of the loan, what's the maximum amount you can take out on a mortgage loan. Those are all preempted, yet states regulate that for state banks. This has been, I mean, again, we've talked about the OCC. This has been the law since 1983 for all real estate but for things like escrow. The escrow regulation came in in 2004. So national banks but for the Ninth Circuit, which I think covers two state escrow laws, national banks don't comply with state escrow laws, unless they want to because it's one of the features they want to do to attract consumers. In terms of how much money, I mean, these are very small dollar amounts. Bank of America put in its brief, and it had evidence in the LESNAC. I think it's the LESNAC how I pronounced it. It doesn't earn interest on these accounts, and it costs a lot of money to maintain them. So I don't think it's so much that it's, again, I don't know what the factual showing would be, but I do know the other side would just say New York banks comply with it. So it's never going to be preempted. I'm just trying to understand the sense of this distinction you're making, and I didn't realize that you were making this distinction. So I'm making this up on the fly. But suppose there were a state that said something like before a loan can be denied, a person has a right to see the bank president. And that's very, it's actually really super inconvenient for the bank. That would fall on your yes, a state can do that side of the line? I think it would probably fall on the no, the state can't. It depends on how broad you interpret sort of the services associated with it. I will say that there are state laws that regulate how the banking statement has to look, what kind of receipts you have to have. If you knew the amount of federal regulations that are just so exhaustive on this, that if banks had to comply with 50 different kinds of patchwork of every law on that, but sort of seeing who the bank, meeting the bank president seems to be similar on how the banking statement has to look. Yeah, it's just suggestive of the idea that it's hard to make this distinction between what concerns your transaction with a customer and what concerns your banking product, which is what I thought you were saying. I think it's very easy when you have an interest rate. I think a harder one is like the Anderson versus California. So it works for this case, but you're asking us to do something that applies to every kind of case. But it works for every case that's been addressed by OCC's regulations since the 2000s. I mean, OCC goes through a laundry list of types of preemptive. They all go to the banking product. They go to the mortgage loan. The government has disavowed that regulation and said it's inconsistent with the statutes. I don't know how much traction that gets you. I think you might as well have heard from the Forest Service. I mean, they literally went against it. Well, I think we heard from the Solicitor General of the United States on behalf of the federal government. Contracting two other Solicitor Generals and saying they didn't even consult with OCC. With all due respect, this is a bank. Where is this line that you've been talking about in your brief? Can you direct me to it? I think that, well, the line is. I didn't see it. I think that's fair on the product. We may have only mentioned the product thing once. The main test is the control test that the Second Circuit applied. Yeah, it's totally different than the control test, isn't it, the test you're asking us to adopt? And wouldn't this product versus consumer test itself generate a lot of litigation over border cases? I don't think so. When we tried to talk about the difference with the definition of state consumer financial law, we talked about this is where it gets very close. We talked about there's a difference between controlling the banking power and controlling the financial transaction with the consumer. And I just think the explanation to that just looks to the product. It's not in your brief. And if I think it's different from the lower court opinion, what are we supposed to do? Then stick with our brief. It's not in your brief. Stick with our brief. You didn't hear anything I said. Well, your brief, the problem is that your brief doesn't explain fair lending laws. And in a way, what you're trying to do is to gerrymander a world in which fair lending laws, which everybody thinks kind of have to apply to national banks, apply to national banks, but nothing else does. Yeah, and I don't think it's gerrymandering unless you think the OCC has gerrymandered. I mean, you've had to have a workable rule since national banks have had real estate lending power since 1983. And this has been the workable rule. The OCC has cardened off the loan. But it has said at the same time, and it wrote to Barney Frank in 2004, but we're going to put fair lending laws to the side. Now, there might be some fair lending laws that might be problematic when they run up to the duty to mitigate risk. But generally, banks just don't have the power to discriminate or commit fraud. And if you can't ever answer a question at oral argument in the brief, then I'm not sure why we have an oral argument. It's pretty central. It's not an incidental question. It's what's preempted. And your brief says everything's preempted, controlled. And now you're saying, there's this new distinction that we've somehow distilled from our cases that heretofore nobody has mentioned. So the amount of non-preempted laws is the exact same in the brief, the fair lending and all generally applicable laws that go to how you form contracts. And Anderson, the only one I added is the fraud laws. I don't think those are in the briefs, but I think they follow. So if you don't want to consider the fraud laws, that's fine. But the basic distinction dividing line, we spent pages and pages saying this court has recognized all the laws that aren't preempted, starting with state contract laws. Thank you, Counsel. Justice Thomas? Justice Alito? Well, I share the difficulty that's been expressed in understanding the difference between a state law that affects a national bank's exercise of the banking power and a state law that regulates the way in which the bank exercises that power in dealing with its customers. I mean, is there some other way to express this? Is there something else? If we look at the instances that have been held to fall on the latter side of that line, some other characteristic that could be identified that would explain the difference? Well, the reason why I like what I'm giving you is it's because the statute defines state consumer financial laws in terms of the transaction. So we stuck to the text of financial transaction, and we think Barnett Bank is talking about the national banking power. But because there is this sort of semantic issue, well, regulate is regulating. You're regulating the power or you're regulating the transaction. It helps to explain what that means. If you wanted the case, it would be Anderson. Anderson talks about it is just changing the identity of the – it's no different than if you had, like, a garnishment or a missing person. But it doesn't affect the underlying function or powers of the bank. And this is a loan. This is literally, like, the most important thing they do other than take deposits. Well, we are – there is the problem that – and you've provided an answer. I'll have to think about it as to why your interpretation doesn't preempt everything. But there's the problem on the other side that Mr. Kahler's argument seems to preempt nothing. If you can presume that anything that's good – that's okay for a state bank is also okay for a national bank, then by definition, nothing is going to be preempted. Maybe he'll have an explanation on rebuttal about what his interpretation preempts. My position better is because I think I've got the status quo on my side. What they have is that Congress is really angry at OCC. But there's no suggestion in legislative history or anything else that they wanted to create all this massive stability. This is the time of the Great Recession. Like, the notion that they wanted to impose on every national bank some query of we no longer know whether the laws of 50 states apply to every single thing we do without anyone noticing, it just seems to me that this is a – as what the former comptroller brief said, it would be a sea change. Okay, one final question just for clarity. Could you walk through the text and show why your interpretation is consistent with the text, the relevant text? Yeah, so the 30 words of text about Barnett Bank that was talked about. We want to talk about significantly interfere. I think the word significant does some work because – does a significant amount of work because not any law that could be said to interfere with the banking power. We've talked about the fair lending laws, talked about the age requirements, the writing requirements. It has to be significant that it has to go to the, you know, authorized federal power. Okay, is what – is the thing that's codified the words taken from Barnett Bank significantly interferes, et cetera, or is it the holding of Barnett Bank? Is it how Barnett Bank itself understood those words? The latter. I think you could say it's both, but it's clearly the latter. I think in their view, you didn't have to enact any reference to Barnett Bank because they just start with significant interference. And case by case? Case by case refers to the OCC in terms of they're saying if you're going to proceed by order or regulation, you'd have to just look at escrow laws because it has to be a substantial – I mean, you might have a debate about what's a substantially equivalent escrow laws. But case by case is not referring to facts. It's referring to you can't just say we want to preempt everything on mortgage loans. You have to look at, like, you know, escrow, down payment, maximum – you have to just go kind of law by law. But it's talking about the OCC. Thank you. Justice Sotomayor? Justice King? Justice Gorsuch? Justice Barrett? Justice Jackson? I just have one thing on your distinction because I'm still trying to follow it. You rely on Anderson. And I guess the other case that sort of implicates the same facts as Anderson is the California case, which you've talked about. And the problem I'm having with your distinction between product or power and the transaction is that in California, the court describes the law at issue there, which it says is preempted, as a statute that attempts to qualify in an unusual way agreements between national banks and their customers and may cause them to hesitate to subject their funds to possible confiscation. So it seems as though the court in this case says the reason why you're preempted is because you are trying – this law is trying to regulate the transaction between the bank, which you say is the reason why in Anderson they would say it's not preempted. So I don't – Yes, 100 percent. And you're just completely correct. What we're saying is you have the control on the power of the banking product, and there's a second fallback test, which is the undue burden. And that undue burden is the practical impact. So if you had a state law that said – and that is the difference between California and the Kentucky law – that said the minimum age requirement is 61 to open up a mortgage, well, that is a law of majority. It clearly would impose an unusual relationship on the relationship between the bank and its customers. So we do think you could go and preempt these laws that do interact with the consumer and the state. Another one would be a state – national banks or any bank can only be open for one hour during the week. That's going to be preempted. Or you have to pay tellers $1,000 an hour. It's going to be preempted, even though, of course, Title VII applies to national banks. But I do think the California case leaves open, and Anderson says, if the state law is so unusual with respect to the bank and its consumers to the point that it's interfering with their operations, it will be preempted. Thank you. Thank you, counsel. Rebuttal, Mr. Taylor? Thank you, Mr. Chief Justice. Just a few quick points in rebuttal. My friend says that the statute contains two different tests, one for when states dictate the attributes of the product or service, which I think she said is preempted, preempted, preempted, and a second undue burden test for some other category of laws. Now, that test is made up, atextual, and, yes, Justice Gorsuch appears for the first time at argument. And this court in Cuomo, I'll just note, rejected a similarly atextual test, although it's not exactly the same, as inconsistent with the text of the statute, and the same is true here. Now, they read 30 words of the text of the statute, which they say is a love letter to Barnett Bank, as excising the very standard that is codified and as nullifying seven pages of their statutory appendix, which is the entire statute, so that the statute would have no real-world effect. Justice Sotomayor, you pointed out that the statute here uses the phrase only if, which is somewhat unusual for a preemption provision, and suggests that in the real world it's as much an anti-preemption clause as a preemption clause. But it's not an exotic provision, Justice Kagan. And if you look at page 15 of our reply brief, this court has actually adopted a significant impact test. That's the word this court has used, even though it's not in the text of the statute. It's related to a cluster of cases. And this court made that up as an administrable line. And if it's comfortable with that as the line when it's not in the statute, then it should be comfortable with that as the line when it is in the statute. Now, there was a cluster of questions about the practical effect, and I just would say three things. The first is the importance of a nondiscriminatory law. That's why a lot of their laws are hypos and not reality, Justice Kagan. But, Justice Alito, that doesn't mean that that is the entire test, just like it would have been under the Treasury Department. You still have laws that conflict, as in Barnett Bank, and you still have laws where there's a real significant interference. Justice Kagan, you gave a hypo where a bank couldn't make a loan unless a person could talk to the president of the bank. If that's nondiscriminatory, it sounds a lot like significant interference to me. And the third point I would make is there's still a role for the OCC to play here. It can do the job that Congress had expected it to do if there is a real problem, like my friend on the other side claims. And their position that this would sow mayhem is pretty offensive to federalism. The idea is that nationwide companies might have to comply with nondiscriminatory state laws that don't conflict with the text of a statute in the states where they do business and that they should be entitled to preempt those statutes as a matter of law without having to show significant interference. And I think that's just inconsistent with the way this typically approaches questions under the Supremacy Clause. And finally, I would note that it's quite clear that Congress passed this statute to do something. It was reacting against what the OCC had done. The OCC said the same 2004 rule remains in effect and the same list of laws are preempted. And Congress said, no, we want the statute to have some real effect. And my friend on the other side reads the statute to have no real world effect. Thank you very much. Thank you, counsel. The case is submitted.